IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANNE MARIE KREIDLER and                    05-CV-1262-BR
MICHAEL S. REED,

        Plaintiff,                         OPINION AND ORDER

v.

MELODY DAWN TAYLOR,
individually, and MELODY DAWN
TAYLOR as Trustee of the
MELODY D. TAYLOR'S CHILDREN
TRUST,

        Defendants.


JOSEPH A. GRUBE
Ricci Grube Aita, PLLC
1601 Second Avenue
Suite 1080
Seattle, WA  98101
(206) 624-5975

        Attorneys for Plaintiffs

JONATHAN M. RACMACHER
McEwen Gisvold LLP
1600 Standard Plaza
1100 S.W. Sixth Avenue
Portland, OR 97204
(503) 226-7321

        Attorneys for Defendants


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Plaintiffs' Motion for Partial Summary Judgment (#40) as to certain counterclaims and affirmative defenses raised by Defendants.

For the reasons that follow, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment as to Defendants' affirmative defenses of duress, mistake, unconscionability, constructive fraud, and fraud and **DENIES** Plaintiffs' Motion as to Defendants' affirmative defenses of unfair trade practices and equitable mortgage. The Court also **GRANTS** Plaintiffs' Motion for Partial Summary Judgment as to Defendants' counterclaims of constructive fraud, fraud, and quiet title and **DENIES** Plaintiffs' Motion for Partial Summary Judgment to the extent Plaintiff seeks summary judgment as to Defendants' counterclaim of unfair trade practices.

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise noted.

On February 24, 1993, Defendant Melody Dawn Taylor (Taylor) purchased property in Gresham, Oregon, as part of her separate estate. The property was only partially developed. Taylor mortgaged the property in June 1997.

On September 10, 1999, Taylor executed a quitclaim deed granting her "right, title and interest" in the Gresham property

2 - OPINION AND ORDER

to the "Melody Dawn Taylor's Children Trust at Snomomish County Washington."  Taylor did not identify a trustee on the quitclaim deed.

Sometime in the summer of 2004, creditors threatened to foreclose on the Gresham property based on Taylor's failure to make payments on the 1997 mortgage.  The collection agency sent Taylor a Demand Letter informing her that she had until August 11, 2004, to pay $96,116.55 in mortgage and escrow costs as well as back property taxes to avoid foreclosure.  At that time, the unpaid property taxes totaled $22,694.00.

In the spring of 2004, Taylor called Plaintiff Ann Marie Kreidler's real-estate office "about a listing in the Seattle area."  According to Taylor, she and Kreidler met "several times," "became friendly," and "even discuss[ed] the possibility of [Taylor] coming to work for [Kreidler]."  "At some point during [their] relationship," Taylor mentioned to Kreidler that "[her] property located in Gresham . . . was facing foreclosure." According to Taylor, she told Kreidler that the property, if developed, would be worth an estimated $1.5 million.  Taylor contends she "approached" Kreidler about a partnership to develop the Gresham property, and Kreidler "agreed to help [Taylor]." Taylor asserts she sought Kreidler's assistance due to Taylor's poor credit.

Plaintiffs contend Taylor represented to them that she owned

3 - OPINION AND ORDER

the Gresham property and agreed she and Plaintiffs would be
"partners on a 50/50 basis . . . to develop the property for
commercial benefit."

On July 23, 2004, Plaintiffs viewed the Gresham property.
On the same day, Plaintiffs went to First American Title Company
to review the title on the property.  Although Plaintiffs did not
purchase title insurance, the parties received a preliminary
title report, which noted title to the Gresham property

> vested in:
>
> Melody Dawn Taylor
>
> Subject to . . . the following:
>
> * * *
>
> 9. Effect, if any, of Quitclaim Deed from Melody
> Dawn Taylor, as her separate estate to The Melody
> Dawn Taylor's Children Trust at Snohomish County
> Washington.
>
> 10. The right, title or interest of The Melody
> Dawn Taylor's Children Trust at Snohomish County
> Washington, as disclosed by an instrument entitled
> Quitclaim Deed which recorded September 13, 1999.

On August 10, 2004, the parties executed two written
agreements relating to the Gresham property.  The first agreement
provides in pertinent part:

> Melody Taylor agrees to alienate and transfer an
> individual 50% undivided interest in the property
> in question to Kreidler and Reed.  Taylor agrees
> to cooperate in every respect with efforts by
> Kreidler and Reed to sell/refinance the property
> given its highest and best use, as soon as
> possible - in no case beyond 3 years from the date
> of this Agreement, without compromising its full

4 - OPINION AND ORDER

value.

Proceeds of a sale or refinance of the property in question must be distributed as follows:  firstly to satisfy all liens of record; secondly to repay Kreidler for funds advanced for reinstatement; thirdly, balance of funds shall be distributed to owners of record.

* * *

It is the intent of the signatories below to realize a profit from ownership of the property in question in the shortest practical time.  The parties may amend this agreement at any time in writing.

The second agreement provided in pertinent part:

This Agreement is Made [*sic*] on August 10, 2004 Between [*sic*] Anne Marie Kreidler, and Michael Reed and Melody D. Taylor regarding the property located at 115 NE 10th Drive, Gresham, OR 97030-5607. . . .  Melody D. Taylor agrees to deed Kreidler and Reed 50% ownership in the above mentioned property in exchange for the services and help from Kreidler and Reed to free the property from being foreclosed on.

* * *

All parties agree to cooperate and share the expenses in the refinancing of the subject property and to:

1.  Pay off the 1st mortgage in the amount of approximately $235,000.00.
2.  Pay off the loan from McDonald financial group in the amount of approximately $118,811.28 + initial loan cost.
3.  Pay any loan fees and expenses in the connection with the refinances.
4.  Pay all taxes and insurance when due.
5.  Pay mechanics lien to plumbing co. of approx $3,300 principle [*sic*][.]

Kreidler and Reed's share in the above expenses shall be 50%, Taylor's share shall be 50%.

5 - OPINION AND ORDER

> (Kreidler and Reed share 25% in all profits and
> expenses.  Taylor's share shall be 50% of all
> profits and expenses.)
>
> All parties are aware that the refinanced loan in
> the amount of approximately $354,500.00 + loan fee
> and expenses shall be an obligation secured by
> subject property of which obligation Kreidler and
> Reed share 50% and Taylor shares 50%
> responsibility.

On August 10, 2004, Taylor executed a quitclaim deed
conveying to Plaintiffs "an undivided 50% interest in [the
Gresham property]."  The quitclaim deed was recorded on
August 14, 2004.  Plaintiffs provided over $118,000 to Taylor's
creditors and the tax authorities pursuant to the two agreements.

On September 7, 2004, Taylor recorded a "modified" version
of the 1999 quitclaim deed in which Taylor added herself as
trustee of the Melody Dawn Taylor's Children Trust.

On October 14, 2004, Plaintiffs faxed Taylor a limited-
liability agreement "pertaining to Gresham Partners L.L.C."
Taylor alleges she realized that Plaintiffs believed they were
entitled to a one-half interest in the Gresham property under the
August 10, 2004, quitclaim deed only after she discussed the
terms of the proposed limited-liability agreement with Kreidler.
Taylor advised Plaintiffs the portion of the property that
contained the business was held in trust and asserted the
quitclaim deed pertained only to the undeveloped portion of the
Gresham property.  Shortly thereafter, the parties' relationship
deteriorated.

6 - OPINION AND ORDER

Taylor has not returned the funds that she received from Plaintiffs, and the parties have not developed the property.

## PROCEDURAL BACKGROUND

On August 13, 2005, Plaintiffs filed a Complaint in this Court on the basis of diversity jurisdiction in which they alleged claims under Oregon law for fraud, unfair trade practices, and breach of contract against Taylor and claims for violation of Oregon's Uniform Fraudulent Transfer Act or unjust enrichment against Taylor and the Trust.

Before Defendants filed a responsive pleading, Plaintiffs filed a First Amended Complaint on August 16, 2005, which contained the same claims and defendants and corrected allegations about Taylor's residency.

On January 23, 2006, Plaintiffs filed a Second Amended Complaint to make their claims more definite and certain.  On February 2, 2006, Defendants filed an Answer to the Second Amended Complaint in which they alleged five affirmative defenses (failure to state a claim, estoppel, unclean hands, "not a consumer transaction," and duress) and three counterclaims (rescission, breach of fiduciary duty, and violation of Washington's Consumer Protection Act).

On July 3, 2006, Defendants amended their Answer and asserted seven affirmative defenses (duress, mistake,

unconscionability, equitable mortgage, unfair trade practices, constructive fraud, and fraud) and four counterclaims (unfair trade practices, constructive fraud, fraud, and quiet title).[1]

On October 10, 2006, Plaintiffs filed a Motion for Partial Summary Judgment seeking an order (1) declaring Plaintiffs own a one-half fee interest in the real property; (2) granting summary judgment to Plaintiffs as to Defendants' "affirmative defenses 1 through 8";[2] (duress, mistake, unconscionability, equitable mortgage, unfair trade practices, constructive fraud, and fraud); and (3) granting summary judgment to Plaintiffs on three of Defendants' counterclaims (constructive fraud, fraud, and quiet title).

## STANDARDS

Fed. R. Civ. P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).  In

---

[1] The counterclaims and affirmative defenses of unfair trade practices, constructive fraud, and fraud are identical.

[2] The Court notes Defendants assert only seven affirmative defenses.  Defendants' misnumbering began with affirmative defense four, which was mislabeled as affirmative defense five, and this numbering mistake continued through the remainder of Defendants' Answer.

response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial.  *Id.*

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id.*  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.* 381 F.3d 948 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than otherwise would be required.  *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  If the resolution of a factual dispute would not affect the outcome of the claim, the

9 - OPINION AND ORDER

court may grant summary judgment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

## DISCUSSION

A federal district court sitting in diversity must apply the substantive law of the forum state. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 426-27 (1996). *See also Erickson v. Desert Palace, Inc.*, 942 F.2d 694, 695 (9th Cir. 1991)(citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). Accordingly, the Court applies Oregon state law to this matter.

**I.    Duress**

Defendants assert an affirmative defense of duress on the ground that Taylor executed the quitclaim deed and entered into the agreements because of economic distress.

"Duress is an unlawful constraint exercised on a person whereby he is forced to do some act against his will." *Oregon Bank v. Nautilus Crane & Equip. Corp.*, 68 Or. App. 131, 142 (1984)(citation omitted). "Whether particular facts are sufficient to constitute a defense of economic duress or business compulsion is a matter of law for the courts, while the question of whether the facts alleged actually exist is a matter for the jury." *Id.* (citation omitted).

To survive summary judgment on their defense of "economic distress," Defendants must establish:  "(1) wrongful acts or

10 - OPINION AND ORDER

threats [by Plaintiffs]; (2) financial distress caused by the wrongful acts or threats, and (3) the absence of any reasonable alternative to the terms presented by [Plaintiffs]." *Id*. (citation omitted).

Defendants allege (1) Taylor had "an agreement in principal" by July 23, 2004, that Plaintiffs would help Taylor to avoid foreclosure; (2) in reliance on that agreement, Taylor stopped looking for "other means to save the property"; and (3) although Taylor requested several times that Plaintiffs "send [her] the loan documentation in advance so I could have an attorney review it," Plaintiffs did not do so. Taylor contends Plaintiffs' "tactic of delaying until the last possible moment, effectively depriving [Taylor] of any other option" was "wrongful" and led to her economic duress.

In *Oregon Bank v. Nautilus Crane & Equipment Corporation*, the defendant sought to avoid the terms of a sales and service agreement that it had entered into with the plaintiff's assignor, NCI Corporation, on the grounds of economic duress. The defendant produced an affidavit of the defendant's president in which he testified in pertinent part:

> In December of 1977, . . . a vice president of NCI
> . . . presented me with a 'Dealer Agreement,'
> . . . . I initially refused to sign it, and
> finally did so only out of duress, because Mr.
> Ball told me that if I did not sign it, NCI would
> sell me no more cranes, which would have put our
> company out of business.

11 - OPINION AND ORDER

68 Or. App. at 142.  The Oregon Court of Appeals concluded "[t]he trial court did not err in concluding that defendant's duress defense is not supported as a matter of law."  The court noted:

> [D]efendant has alleged only that NCI threatened to cease doing business with it if Gordon did not sign the agreement and that defendant would have gone out of business but for NCI's supply of cranes.  It is well established, however, that threats to do what the threatening person had a legal right to do does not constitute duress. Here, defendant has failed to assert facts that would support the legal conclusion that NCI had an obligation to continue to supply cranes to defendant.  Even assuming that NCI had such an obligation, however, defendant has failed to allege that it had no other alternative than to sign the contract, that it could not obtain cranes from another source or that its legal remedies for breach of contract were insufficient.

*Id*. at 143.

Similarly, in *Gruver v. Midas International Corporation*, the plaintiffs purchased a franchise from the defendant.  925 F.2d 280, 281 (9th Cir. 1991).  The franchise agreement allowed the plaintiffs to terminate the agreement with a thirty-day notice. *Id*.  Eventually, the plaintiffs informed the defendant that they wanted to terminate the agreement because the franchise was not profitable.  The defendant delayed three and one-half months before drawing up a termination agreement that included a release of all claims against the defendant, refused to extend the plaintiffs further credit, and required the plaintiffs to pay cash for all items purchased from the defendant.  *Id*. at 282. The plaintiffs signed the termination agreement even though they

12 - OPINION AND ORDER

were aware of the release provision.  *Id*.  Thereafter, the
plaintiffs brought an action against the defendant and alleged
the termination agreement was invalid because they entered into
the agreement under economic duress.  *Id*.  The plaintiffs alleged
the defendant acted wrongfully when it terminated their credit
line and did not give one of the plaintiffs sufficient time to
review the termination agreement.  *Id*. at 282-83.  The Ninth
Circuit affirmed the district court's decision to grant summary
judgment to the defendant on the issue of economic distress.  *Id*.
The Ninth Circuit found the defendant's contract with the
plaintiffs "gave [the defendant] the right to set the credit
terms for [the plaintiffs'] purchases of Midas parts.  The
exercise of a legal right is not a wrongful act."  *Id*.  The court
further reasoned the defendant's alleged failure to give one of
the plaintiffs sufficient time to read the termination agreement
"did not cause the [plaintiffs'] financial distress.  Thus it
does not support a claim of economic duress."  *Id*. at 283.

    Defendants here have not offered any evidence to show
Plaintiffs had a legal obligation to assist Taylor in avoiding
foreclosure.  Thus, Plaintiffs' refusal to provide Defendants
with $118,000 unless Taylor signed the quitclaim deed and the
agreements was not "wrongful" because  a lender rightfully may
require security for a loan.  Moreover, Defendants failed to
offer any evidence to establish that they did not have any

13 - OPINION AND ORDER

alternative to signing the quitclaim deed and the agreements.  In fact, Taylor testified in her Declaration that she was "pursuing other avenues for refinancing the mortgage," and she rejected the offer of at least one potential lender because the lender "would have required a relatively high rate of interest."  This testimony belies Defendants' contention that Taylor did not have any alternative to signing the quitclaim deed and the agreements.

Based on this record, the Court concludes Defendants have not established facts sufficient to survive summary judgment on their affirmative defense of economic duress.  Accordingly, the Court grants Plaintiffs' Motion for Summary Judgment as to Defendants' affirmative defense of duress.

## II.  Unilateral Mistake

Defendants also assert an affirmative defense of unilateral mistake.

"To avoid a contract on account of a unilateral mistake it is necessary that there be a mistake, that the mistake is basic and known to the other party, or that circumstances are such that the other party, as a reasonable person, should have known of the mistake." *Gardner v. Meiling*, 280 Or. 665, 674 (1977).

"A mistake justifying rescission must be a misapprehension as to a fact which is material and basic to the agreement." *Id.* at 674-75.  A unilateral mistake as to the legal effect of an agreement is not a sufficient basis for avoidance. *See Meyer v.*

14 - OPINION AND ORDER

*Kesterson*, 151 Or. App. 378, 394 (1997)("Defendant's mistake concerning the legal effect of the document is not the type of mistake that provides a ground for rescission."). *See also Shell Oil Co. v. Boyer*, 234 Or. 270, 277 (1963)("[i]nequity sufficient to enable one to evade his contractual duties must be more than mere mistake concerning the legal effect of an instrument knowingly executed.  It is not sufficient for a person desiring to be relieved of a duty to say, 'I did not mean to make such a bargain.'").

Defendants allege unilateral mistake because Taylor believed "the quitclaim deed was security for the loan" and did not realize "the legal significance of the Agreements [Taylor] signed."  In her Declaration, Taylor testified in pertinent part:

> It was my understanding that a quitclaim deed did not transfer title, and was used only to clear clouds on title.  I had heard at some point that title companies would not insure title granted by quitclaim deed and thus I assumed that Reed meant to use this document as security for the loan.  At no point did Reed or Kreidler explain that this was the intent of the document or that Plaintiffs were expecting that I actually transfer a one-half interest in the Property to them.

Defendants have not alleged or established a mistake as to a fact that was "material and basic" to the quitclaim deed and the agreements.  Although Defendants may have been mistaken about the legal effect of the quitclaim deed and the agreements Taylor signed, that kind of mistake is not a sufficient basis under *Meyer* for rescission or avoidance of either the quitclaim deed or

15 - OPINION AND ORDER

the agreements.

Accordingly, the Court grants Plaintiffs' Motion for Partial Summary Judgment as to Defendants' affirmative defense of unilateral mistake.

## III. Unconscionability

Under Oregon law, unconscionability is a legal issue that the court must assess at the time of contract formation. *W.L. May Co. v. Falco-Ford Corp.*, 273 Or. 701, 707 (1975).

Oregon courts have not adopted a universal definition as to what constitutes unconscionable conduct sufficient to prevent enforcement of a contract. The Oregon Supreme Court, however, has looked to the Uniform Commercial Code and noted the basic test of unconscionability in a commercial context is whether

> "in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under circumstances existing at the time of the making of the contract. . . . The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power."

*Id. (*quoting UCC § 2-302, CMT. 1).

Defendants contend the agreements here are unconscionable because Plaintiffs seek to receive a one-half interest in the Gresham property in exchange for giving Taylor $118,000. As noted, Taylor estimated the property would be worth $1,500,000 if it were developed. Thus, Defendants contend the quitclaim deed

16 - OPINION AND ORDER

and the agreements are "grossly one-sided and . . . uncon-
scionable."

In *Carey v. Lincoln Loan Co.*, the defendant owned a number
of houses and began selling them on contract in order to maintain
an adequate income flow for his wife.  One house the defendant
sought to sell had been vacant for several years and "had
deteriorated to a deplorable condition."  203 Or. App. 399, 416
(2005).  The plaintiffs, who had limited options for purchasing a
house due to their low income, approached the defendant about
purchasing property.  The defendant agreed to rent the
dilapidated house to the plaintiffs for three years with an
option to purchase within that period for $17,950.  *Id*.  At the
end of the lease term, the plaintiffs purchased the property and
signed a sale contract prepared by the defendant that included,
among other things, a provision that the land sale contract "is
personal . . . and cannot be sold, assigned or hypothecated
without written consent of [the defendant.]"  *Id*. at 417.  The
contract also prohibited the plaintiffs from paying "more than
$2,000.00 on the unpaid principal balance during any one calendar
year."  *Id*.  Six years later, the plaintiffs attempted to sell
the house, but they found the above provisions made it impossible
to find a buyer.  *Id*. at 418.  The plaintiffs brought an action
against the defendant alleging, among other things, the above
provisions were unconscionable.  *Id*.  When examining a provision

17 - OPINION AND ORDER

for unconscionability, the Oregon Court of Appeals noted a court
may consider

> gross inequality of bargaining power, together
> with terms unreasonably favorable to the stronger
> party, [which] may confirm indications that the
> transaction involved elements of deception or
> compulsion, or may show that the weaker party had
> no meaningful choice, no real alternative, or did
> not in fact assent or appear to assent to the
> unfair terms.

*Id.* at 422.  The court found (1) the plaintiffs "had no other
apparent choice for adequate housing . . . [, and] [their need to
purchase was far greater than defendant's need to sell"; (2) the
plaintiffs did not have any experience buying houses while the
defendant had been in that business for a number of years; and
(3) only the defendant knew the effect of the provisions at
issue.  *Id.* at 425.  The court also found there was not any
evidence "of a commercial need for an absolute restriction on
assignment in the defendant's situation" and "the power that the
limitation on prepayment gives defendant . . . is entirely
disproportionate to its purpose."  *Id.* at 427-28.  The court,
therefore, concluded these provisions were unconscionable.  *Id.*
at 428.

Here Defendants' need to avoid foreclosure was greater than
Plaintiffs' need to purchase the property.  Unlike the plaintiffs
in *Carey*, however, Defendants had an alternative to signing the
agreements with Plaintiffs; *i.e.*, Taylor had at least one other

viable source of financing.  Nevertheless, she chose to deal with Plaintiffs because they offered a lower interest rate.

In addition, although the record establishes Kreidler is a real-estate agent and Reed is a mortgage banker, Taylor also was licensed and active as a real-estate sales agent from 1977 to 1993, and apparently Taylor and Kreidler even had discussions about Taylor working for Kreidler in her real-estate business. Moreover, Taylor previously executed and/or was the recipient of quitclaim deeds prior to the deed at issue here:  a March 12, 1998, quitclaim deed from her former husband and the September 10, 1999, quitclaim deed to the Trust.  Thus, the record establishes Taylor was not so inexperienced in or unfamiliar with real-estate transactions as to constitute substantial inequality of bargaining power or knowledge between Taylor and Plaintiffs at the time Taylor signed the agreements at issue and executed the quitclaim deed.

Accordingly, the Court concludes the quitclaim deed and the agreements are not unconscionable and grants Plaintiffs' Motion for Partial Summary Judgment as to Defendants' affirmative defense of unconscionability.

**IV.  Equitable Mortgage**

Defendants allege "[at the time the parties executed the Agreements, both parties characterized the deed as necessary as 'security for the loan.'  To the extent that the deed is a valid

encumbrance on the Property, it was intended as a mortgage only."

Plaintiffs move for summary judgment as to Defendants' affirmative defense that the deed constituted an equitable mortgage on the ground that Defendants have not produced any evidence that the money Plaintiffs paid to Taylor constituted a mere loan secured by the Gresham property.

"A deed absolute on its face may be shown to be a mortgage. The proof must be by clear and convincing evidence.  'There is no conclusive test of universal application to determine whether a deed, absolute on its face, is a mortgage.'" *French v. Boise,* 50 Or. App. 369, 375 (1981)(quoting *Blue River Sawmills v. Gates*, 225 Or. 439, 461 (1961)).  Oregon courts have held

> "if the intent appears that property was conveyed and received as security for the fulfillment of an obligation, the form of the instrument becomes immaterial and the true nature of the transaction may be shown by parol evidence.  Neither fraud, mistake nor accident need be proven.  The primary inquiry relates to the intention of the parties at the time the transaction was consumated [*sic*]."

*Id*. at 376 (quoting *Umpqua Forest Ind. v. Neenah-Ore. Land Co.*, 188 Or. 605, 614 (1950)).

> Factors which may be used to help determine the intent of parties include, but are not limited to: (1) the situation of the parties including their business and social relationship, (2) price fixed in relation to the actual value of the property conveyed, (3) surrender of possession by grantor, (4) payment of taxes, (5) payment of rent, (6) liability by grantor to pay interest, (7) financial circumstances of the grantor, and (8) conduct of the parties before and after the transaction.

*French*, 50 Or. App. at 376. (citations omitted).

In *French*, the plaintiffs owned a dairy farm and began having serious financial trouble. The plaintiffs did not have the funds to make the final balloon payment on their land contract, and they were heavily indebted to Elliott Feed and Seed Company and other creditors. *Id*. at 371. By 1977 the plaintiffs owed $130,000 to Elliott Feed and Seed and $10,000 to other creditors. Elliott Feed and Seed offered the plaintiffs $50,000 "for a release of [the plaintiffs'] equity in the property. *Id*. at 372. The plaintiffs contacted a real-estate broker, who informed the plaintiffs that their farm and associated equipment would sell for approximately $180,000. *Id*. On December 7, 1977, the plaintiffs advised the defendants, who had been friends of the plaintiffs for thirty years, about their financial trouble. *Id*. The plaintiffs alleged the parties agreed the defendants would (1) pay off the plaintiffs' creditors, (2) buy more dairy cows, (3) and build a new barn. In addition, according to the plaintiffs, (1) the plaintiffs would operate the farm in a partnership with the defendants, (2) Orlando French would receive a salary and 50% of the net profit, and (3) the defendants would receive 10% of the gross profit and 50% of the net profit. *Id*. at 373. Defendants contended (1) they agreed to purchase the property outright for the amount of debt outstanding without any right of the plaintiffs to repurchase it; (2) Orlando French

would work as an employee of the defendants for salary plus 90%
of the net profits; and (3) the plaintiffs would receive use of
the house, gasoline for personal use, milk, and electricity
without cost. *Id*. On January 12, 1978, the plaintiffs executed
a quitclaim deed releasing their interest in the property,
livestock, and farm machinery to Elliott Feed, who, in turn,
executed and delivered a warranty deed conveying all of the
property to the defendants. *Id*. at 374. The defendants paid the
debt to Elliott Feed as well as delinquent taxes and other
closing fees.

Ultimately, the plaintiffs filed an action against the
defendants in which the plaintiffs asserted the deeds constituted
either security instruments or an equitable mortgage. The
defendants, however, contended the deeds constituted an absolute
sale. The Oregon Court of Appeals found the relationship of the
parties and the fact that the plaintiffs did not surrender
possession of the property nor pay rent were consistent with the
interpretations of both the plaintiffs and the defendants. *Id*.
at 376. The court, however, concluded the plaintiffs had
produced clear and convincing evidence that the deeds were
intended as an equitable mortgage because the plaintiffs had at
least three possible options at the time the parties made the
agreement: sale of the property to Elliott Feed for $50,000,
sale of the property through the real- estate agent for $180,000,

22 - OPINION AND ORDER

or entering into the agreement with the defendants.  The first
two options would have provided the plaintiffs with $40,000 cash
outright whereas the final option, if interpreted as an outright
sale, left the plaintiffs without cash or job security.  *Id*. at
378.

Here Taylor did not have a long-standing relationship with
Kreidler and, in fact, knew Kreidler for only a few months before
Taylor signed the quitclaim deed.  In addition, there was not any
provision in either the quitclaim deed or the agreements for
interest payments to Plaintiffs.  Although Taylor had at least
one other avenue of financing, there is not anything in the
record to suggest that Defendants would have received more
favorable terms from another source.  These factors weigh in
favor of Plaintiffs' assertion that their intent was to purchase
50% of the property outright.

On the other hand, Taylor was in dire financial straits.  At
the time she contacted Kreidler about financing, she had, at
best, two months to obtain $118,000 to avoid foreclosure.  In
addition, half of the value of the property after development
might be as much as $750,000.  The $118,000 that Plaintiffs paid
to Taylor, therefore, could be viewed as inadequate consideration
under *French* for a one-half interest in the property if it was
developed.

Thus, there is a close question as to genuine issues of

23 - OPINION AND ORDER

material fact regarding the parties' intent.  Accordingly, the
Court denies Plaintiffs' Motion for Partial Summary Judgment as
to Defendants' affirmative defense of equitable mortgage.

## V.    Actual and Constructive Fraud

Defendants assert actual and constructive fraud as
counterclaims and as affirmative defenses.  Plaintiffs move for
summary judgment as to these affirmative defenses and
counterclaims on the ground that Defendants cannot prove either
constructive or actual fraud by clear and convincing evidence as
required under Oregon law.

### A.    Constructive Fraud

In their Answer, Defendants contend "Kreidler's
treatment of [Taylor] . . . created a 'confidential
relationship.'"  According to Defendants, Taylor "had serious
doubts as to whether she should be signing [the agreements and
the deed,] . . . but trusted Kreidler to act in Defendant's best
interest."  Defendants also contend Kreidler "abused [Taylor's]
confidence  . . . by waiting to make the loan until Defendant had
no reasonable alternative."

Oregon courts have emphasized constructive fraud "is
simply a catch-all term for a variety of transactions in which
the courts have decided that fraud-type relief is appropriate;
many of those transactions do not require either intent to
deceive or actual dishonesty of purpose."  *Pollock v. D.R.*

*Horton, Inc.-Portland*, 190 Or. App. 1, 21 (2003)(citing *U.S. Nat'l Bank v. Guiss*, 214 Or. 563, 585-86 (1958)).  Although the Oregon Supreme Court "has expressed some skepticism about the theory," *id.* at 22 (citing *Knight v. Woolley Logging Co.*, 278 Or. 691, 694-95 (1977)), it has noted "[c]onstructive fraud usually arises from a breach of duty where a relationship of trust and confidence exists.  Indeed it is said to arise from the very conception and existence of such relationship." *United States Nat'l Bank of Portland v. Guiss*, 214 Or. 563, 586 (1958) (citations omitted).

The Oregon Supreme Court has cited with approval the following *Restatement (Second) of Trusts* definition of a confidential relationship:

> A confidential relation [*sic*] exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind . . . .  If one person is in a confidential, but not in a fiduciary relation {*sic*] to another, a transaction between them will not be set aside at the instance of one of them unless in fact he placed confidence in the other and the other, by fraud or undue influence or otherwise abused the confidence placed in him . . . .  The burden of showing an abuse of a confidential relation is upon the person seeking to set aside the transaction.

*Ingersoll v. Ingersoll*, 263 Or. 376, 379 (1972)(citing *Restatement (Second) of Trusts* § 2, CMT. b at 7 (1959)).

Oregon courts have found confidential relationships exist generally in a number of circumstances, including between

(1) a doctor and his patient, *Humphers v. First Interstate Bank of Oregon,* 298 Or. 706 (1985); (2) a mother and a daughter, *Smith v. Ellison*, 171 Or. App. 289 (2000); (3) a pastor and a church member, *Erickson v. Christenson*, 99 Or. App. 104 (1989); and (4) a husband and a wife, *In re Marriage of Pierce,* 206 Or. App. 699 (2006). Taylor's relationship with Kreidler, however, more closely resembles the relationship of the parties in *Knight v. Wooley Logging Co.*

In *Knight*, the plaintiff sought an order setting aside an extended timber deed on the ground of constructive fraud. The plaintiff and the owner of the defendant timber company, Harold Wooley, were cousins. 278 Or. at 693. In addition, they were "good friends" and "longtime residents" of the same neighborhood. *Id*. The plaintiff testified she trusted and confided in Wooley and that she "accepted [Wooley's] word" as to the value of the timber on the plaintiff's property. *Id*. at 696-97. The Oregon Supreme Court concluded "[t]he association between the [plaintiff and Wooley] was informal and neighborly, but did not rise to the level of a confidential relationship." *Id*. at 696.

Here Taylor initially contacted Kreidler in a business capacity. Even if Taylor became friends with Kreidler over the relatively short time that they interacted, the Court concludes Taylor has not offered sufficient evidence to establish by clear and convincing evidence that her relationship with Kreidler rose

26 - OPINION AND ORDER

to the level of a confidential relationship. *See Lozano v. Summit Prairie Cattlemens Ass'n,* 155 Or. App. 32, 39 (1998)(the individual seeking to set aside a transaction on the grounds of constructive fraud must establish by clear and convincing evidence a confidential relationship existed between the parties).

Accordingly, the Court grants Plaintiffs' Motion for Partial Summary Judgment as to Defendant's counterclaim and affirmative defense of constructive fraud.

**B.    Actual Fraud**

In their counterclaim and affirmative defense as to actual fraud, Defendants allege (1) Kreidler "represented to [Taylor] that she would 'help' [Taylor] by loaning her the necessary funds; (2) Plaintiffs "characterized the Agreements . . . were necessary [*sic*] as 'security for the loan'"; (3) Plaintiffs made "their respective statements" knowingly and with the intent to misrepresent the legal significance of the agreements and to deceive Taylor; and (4) Taylor relied on Plaintiffs' material misrepresentations.

Plaintiffs seek summary judgment on Defendants' counterclaim and affirmative defense on the ground that Defendants cannot establish the elements of fraud.

Under Oregon law, a party alleging fraud must establish by clear and convincing evidence:

27 - OPINION AND ORDER

> "(1) the accused had falsely represented a
> material fact; (2) the accused knew that the
> representation was false; (3) the
> misrepresentation was made with the intent to
> induce the recipient to act or refrain from
> acting; (4) the recipient justifiably relied on
> the misrepresentation; and (5) the recipient was
> damaged by that reliance."

*Pollock*, 190 Or. App. at 20 (quoting *In re Brown*, 326 Or. 582, 595 (1998)). *See also Oregon Pub. Employees' Ret. Bd. ex rel. Oregon*, 191 Or. App. 408, 423-24 (2004)(fraud must be proven by clear and convincing evidence). "Justifiable reliance requires a 'right to rely' which is acquired by taking reasonable precautions to safeguard one's own interests." *Gregory v. Novak*, 121 Or. App. 651, 655 (1993).

Here, as noted, Taylor had been a party to at least two quitclaim deeds prior to executing the deed at issue. In addition, Taylor was licensed and active as a real-estate agent for a number of years. Taylor, therefore, had some familiarity with the purpose and effect of quitclaim deeds. Thus, Taylor's failure to safeguard her own interest with respect to the Gresham property is not a ground for justifiable reliance to support a claim of fraud.

Based on this record, Taylor has not offered sufficient evidence to establish by clear and convincing evidence that she justifiably relied on Plaintiffs' alleged assertions that the quitclaim deed was merely security for a loan.

Accordingly, the Court grants Plaintiffs' Motion for

28 - OPINION AND ORDER

Partial Summary Judgment as to Defendants' counterclaim and
affirmative defense of actual fraud.

**VI.  Unfair Trade Practices**

As noted, although Plaintiffs assert they move for summary
judgment on all of Defendants' affirmative defenses, which
include an affirmative defense for unfair trade practices,
Plaintiffs only move for summary judgment against three of
Defendants' counterclaims; *i.e.*, Plaintiffs did not move for
summary judgment against Defendants' counterclaim for unfair
trade practices even though this affirmative defense and
counterclaim have the same factual and legal basis.

In any event, Plaintiffs do not address Defendants'
allegations of unfair trade practices nor provide any factual or
legal basis for opposing same as an affirmative defense or as a
counterclaim.

Accordingly, to the extent Plaintiffs intended to move for
summary judgment against Defendants' affirmative defense and/or
counterclaim of unfair trade practices, the Court denies
Plaintiffs' Motion.

**VII. Quiet Title**

In their fourth counterclaim, Defendants assert Taylor
transferred her title and interest in the property to the Trust
through the September 10, 1999, quitclaim deed.  According to
Defendants, therefore, the August 10, 2004, quitclaim deed could

29 - OPINION AND ORDER

not convey any interest in the property to Plaintiffs because Taylor did not have any interest to convey.

Plaintiffs move for summary judgment on this counterclaim on the grounds that (1) the September 10, 1999, quitclaim deed was ineffective because it did not name a grantee with capacity to take title and (2) even if the deed was effective, Taylor should be estopped from asserting its legal effect because she represented to others, including courts, that she is the owner of the property.

The September 10, 1999, quitclaim deed identified the Trust as the grantee. Under Oregon law, however, an unincorporated association that is not organized for a charitable or business purpose does not have capacity to take title to property. *See, e.g., State v. Sunbeam Rebekah Lodge No. 180 of Hermiston Or.*, 169 Or. 253, 266 (1942)(adopting *Restatement of the Law of Trusts,* which reflects "an unincorporated association . . . can not take or hold the legal title to land and can not therefore take or hold land in trust."). *See also Hitchman v. Hudson,* 40 Or. App. 59, 64 n.1 (1979)("Even assuming . . . [the homeowners association] existed as an informal unincorporated association, such an entity may not hold title to real property.").

Defendants do not allege the Trust was organized for either a charitable or business purpose. As noted, under Oregon law the

30 – OPINION AND ORDER

Trust could not take title to the property through the September 10, 1999, quitclaim deed.  The September 10, 1999, quitclaim deed, therefore, did not transfer Taylor's title in the property to the Trust.

Accordingly, the Court grants Plaintiffs' Motion for Partial Summary Judgment as to Defendants' counterclaim of quiet title.

Because the Court grants Plaintiffs' Motion as to Defendants' counterclaim on the basis that the September 10, 1999, quitclaim deed was ineffective, the Court does not address Plaintiffs' estoppel argument.

## VIII. Request for A Declaration that Plaintiffs Own A One-Half Fee Interest in the Property

Plaintiffs also request a declaration that they own a one-half fee interest in the property.  As noted, however, there are material issues of disputed fact with respect to Defendants' affirmative defenses of equitable mortgage and unfair trade practices and Defendants' counterclaim of unfair trade practices. Moreover, there are issues of fact precluding a declaration as to ownership of the property relating to Plaintiffs' status as *bona fide* purchasers of the property.  Specifically, the preliminary title report that Plaintiffs admit they requested and reviewed reflects the presence of the quitclaim deed to the Trust.  In addition, Taylor testifies in her Declaration that she told Kreidler that her children owned the property in trust.

Accordingly, the Court denies Plaintiffs' Motion for Partial

31 - OPINION AND ORDER

Summary Judgment to the extent that Plaintiffs request a declaration that they own a one-half fee interest in the property.

## CONCLUSION

For these reasons, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment (#40) as to Defendants' affirmative defenses of duress, mistake, unconscionability, constructive fraud, and fraud and **DENIES** Plaintiffs' Motion as to Defendants' affirmative defenses of unfair trade practices and equitable mortgage.  The Court also **GRANTS** Plaintiffs' Motion for Partial Summary Judgment as to Defendants' counterclaims of constructive fraud, fraud, and quitclaim deed and **DENIES** Plaintiffs' Motion for Partial Summary Judgment to the extent Plaintiff seeks summary judgment as to Defendants' counterclaim of unfair trade practices.

IT IS SO ORDERED.

DATED this 18th day of January, 2007.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge


32 - OPINION AND ORDER